Secretary, United States Department of Veteran Affairs. Ms. Randles, take your time and when you're prepared, please proceed. Good morning, your honors. May it please the court. Ms. Randles? Thank you. Georgette Sherman was a military veteran and after she spent ten years in the military, she went back and got her B.A. in criminal justice and a degree in radiology sciences with honors. And she began working for the medical center in Kansas City, working for veterans to help them in their pursuit of health. She went to work at the KCBA in 2005 and then she became a supervisor for the medical support assistance in radiology in 2009. At the time she took that position, she was the lowest grade and lowest paid of all of the M.S.A. supervisors at the V.A. So she applied for a new position at the Office of Community Care as the supervisor for M.S.A.s in that position. Prior to receiving that position, she had outstanding reviews and she got that position because of those reviews. But over the course of less than one year, the events forced her out and eventually forced her out of the V.A. Let me ask you please, counsel, if I may interrupt you for a moment. The district court's summary judgment order focused on three alleged adverse actions that you advanced in furtherance of your case. And you focused on those in your summary judgment papers? Yes. Are those the ones on which you continue to rely? The adverse job actions? Those three particular ones that were focused on in the summary judgment proceedings. Are those the only three that are here? Well, no, Your Honor. I think that the focus in the summary judgment proceedings was on, if you put them in broad categories, the first of the adverse actions was the lack of training. The second of the adverse actions was the removal from her position into a forced fact finding and then placing her in the lowest paid position in the V.A. And then the third was the constructive discharge. So in that sense, in the broad overview. That's what I'm talking about. Yes. Those are the three. Yes. In the broad overview, those are the three adverse job actions that we're talking about. Thank you. But with regard to the processing of the summary judgment, we believe the court made four major errors. The first is that he stepped out of his role as gatekeeper and became fact finder in this case. And as a result, the facts that he found undercut the ability of the plaintiff to establish her causes of action. The second is he found no adverse action in violation of the Muldrow case that came down from the Supreme Court recently. The third error that the lower court made is that he found no evidence of racial motive, ignoring the McDonnell-Douglas burden shifting standard and the testimony of Michael Woods, Candace Broom, and Georgette Sherman with regard to the motive of the defendants. What was your evidence of race as a motive? There was a little bit of direct evidence. The little bit of direct evidence was that there were two racial comments that were made to Georgette Sherman directly from Angela Fry. But then there was also direct evidence from Candace Broom and from Michael Woods indicating that they had actually observed Ms. Fry engaging in behavior that singled out the only black supervisor in a manner that Was that testimony specific or was it cast in a sort of a general way? It was both. Okay. If you may, if you will please, focus on some specific thing that she was supposed to have said or done. Sure. With regard to the specific, the thing that she did most often that was seen by Candace Broom, Michael Woods, and others in the room was she would tell Georgette Sherman, I don't like the way you talk. Just sit down and be quiet. And she did that on multiple occasions in front of the entire staff when she was the only black supervisor and the only one that was ever addressed in such a denigrating or humiliating manner. Not only that, Ms. Broom was actually the victim of harassment herself in a situation in which Ms. Fry pushed her into a corner, screamed at her, and used some verbiage that was inappropriate to the point that Ms. Broom broke down in tears and had to leave for the day. She believed that that was racially motivated because there were three things that occurred. First, she and another white MSA had done the exact same thing. The white MSA had more discipline than she did, but Ms. Broom was the one that was given discipline but the white individual was not. That happened on three occasions that Ms. Broom testified to, as well as the assaultive behavior that Ms. Fry engaged in with Ms. Broom that she didn't engage in with any other individuals. So that was very specific evidence that Ms. Fry had a racial motive in dealing with the MSAs. What's more, Ms. Sherman testified specifically that she had come into the unit and discovered that the black MSAs were given more work and of a different caliber than the white MSAs. And so her first job duty was to take on and redistribute some of the workload so that all of the workload was not falling on the black MSAs. She took that to Ms. Fry and Ms. Fry engaged in behavior that was denigrating and humiliating, causing her to file a complaint of discrimination in June of 2019. June of 2019 was also when the Mission Act came into being, where the Mission Act changed some of the job duties for the MSAs and for Ms. Sherman. At that point in time, Ms. Fry did not allow Ms. Sherman to get any training of any kind whatsoever on the Mission Act. Now she was supposed to. She was already lined up with Rebecca Johan to go with her to Florida to specifically train on Mission Act standards. That was taken away. The black MSAs and the white MSAs were flown to Florida for training on the Mission Act, as was Ms. Johan and Ms. Fry, but Ms. Sherman was the only supervisor not allowed to take that training. So in order to make this happen, Ms. Sherman actually asked to pay for her own training, and that was denied. So the only way she got any training— Did the employer put forth some non-discriminatory reason for denying the training? In that instance, no. There hasn't really been any discussion as to why training was denied. In the judgment from the lower court, he said that the allegations were vague. We believe that the allegations are very strong because we said there was no training, and then we laid out in the statements of facts that he ignored that she had been supposed to go to Florida, and that was denied. She was supposed to have trained with the other MSAs, and that was denied. So she was not supplied any reason for the denial? We don't. As a matter of fact, they said, well, she's been trained, but there's no evidence in the record that she received any of the training. And so there's not a denial saying that, well, she was denied training on this instance because of this non-discriminatory reason or that. They just said, well, she was trained, but there's no evidence in the record that would establish that she was trained on the Mission Act. And so by ignoring the plaintiff's statement of fact, the court erred by acting as the fact finder instead of the gatekeeper in this instance. And again, the court's order merely says that the allegations concerning training are vague. We do not believe the allegations are vague, and we established specific instances in which she was not allowed to be trained. And so in that circumstance, we believe that that establishes not only that there was a motivation, a retaliatory motivation, but also she was the only black individual who was a supervisor there, and she was treated completely differently than the white MSA supervisors. So we believe that that piece of evidence establishes a number of facts, including motive with regard to that this was based on race. Counselor, you're within your rebuttal time. You can continue if you like or preserve it. I'll preserve the rebuttal time. Thank you, Your Honor. Thank you, Ms. Randalls. Mr. Ray. Good morning, Your Honor. My name is Jeff Ray. I'm with the U.S. Attorney's Office, and I'm here today representing Douglas Collins, the Secretary of Veterans Affairs. On behalf of the Secretary, I'm here today to urge you to affirm the judgment entered by the district court below, based primarily on the summary judgment ruling, which we believe is error free. With all due respect to Ms. Randalls, a lot of allegations were made. A lot of factual assertions were made. It's our belief those are not supported by the record, and it was the belief of the district court that they were largely not supported by the record. Vague allegations that training was denied. Well, that was pretty specific. It referred to specific training on a specific subject that she was not given. And I believe if you will look at the actual record. Well, what does the actual record tell us? I believe the actual record shows she did not go to Florida, but that other training was made available to her. I apologize. I don't have the transcript with me. But to the point, as the district court said, there simply was only vague allegations. What does the record tell us about why she was denied the Mission Act training that was available to the others who were in a similar position? The Florida training, my recollection, and I will freely admit it is just my recollection, was they did not want everyone to be gone from the OCC office at the time, and that there were other training available, and they felt it was more important for the line MSAs, black and white, to receive the training than the supervisor to be overseeing them. That was a decision they made. Again, I don't have the transcript or the record in front of me to give you that citation, but I believe that's established in the record. We believe other training was provided to her, as established in the record, and that other training was available to her, certainly training appropriate for someone in a supervisory position as opposed to a line MSA who deals directly with outside providers and with VA patients in setting up outside health care. Moreover, we don't believe that there is any evidence to support a finding that the denial of this training was racially motivated. Ms. Brome makes allegations about her own personal situation, but ultimately the test here, unless we have an out-and-out utter racist for a supervisor, is how did Ms. Fry and Ms. Sherman get along? And they clearly did not get along, but there's simply no evidence to support the fact that it was based on race. They clearly had a conflict. This happens all the time in the workplace. It happens between black employees. It happens between white employees. In this case, it happened between an employee who was black and an employee who was white. We believe there's no evidence that there was a racial motivation here sufficient to satisfy the prima facie case, and therefore that there was no prima facie case of race discrimination. What led to the reassignment? The reassignment arose because there was an investigation into misconduct that was believed to be occurring. I don't believe the misconduct is spelled out in the record. It was the policy of the VA, which was their right under the collective bargaining agreement, if they felt it was appropriate to reassign Ms. Sherman temporarily to another position, which they did. They did it. She maintained her pay. She also maintained her designation as an MSA supervisor. No harm accrued to her as a result of that. In large part, that's evidenced by the fact she got a promotion afterwards, was actually able to get a superior position at a GS-9 after this reassignment, which occurred during the period of the investigation. Again, we don't believe that that reassignment was an adverse employment action, even under Muldrow. We don't believe that any harm accrued to her, that it was an appropriate reaction by the VA to the misconduct investigation. And even if, at the end of the day, the court isn't comfortable stopping at the prima facie case as the district court was, we believe that the ongoing investigation, at a minimum, provided a non-discriminatory reason for the reassignment and, therefore, is not a basis in which to find a discrete act. Was the investigation completed, or did she leave employment before it was? My understanding is the investigation was not completed and that she did retire from the VA. Before it was completed, or it just was never done? Before it was completed. My understanding, based on the record, is that the investigation was ongoing at the time she retired. With respect to the other two discrete acts that were mentioned, and I guess we've already mentioned the removal from the position, the Florida VA job opportunity, we believe the district court properly concluded that that was hearsay upon hearsay upon hearsay and was entirely indefinite, both as to time and what was said. And there's not even any argument. The argument was that it went to state of mind. I wasn't sure what that meant. Well, I was going to point that out. In the brief, Ms. Randall seems to indicate that the evidence of the Florida job offer not being successfully obtained was not being offered for the truth of the matter, but simply to show that she was considering retirement. Accepting that as true, well, it certainly can't be evidence of an adverse employment action if it's not being offered for the truth of the matter asserted. We believe ultimately all three of the discrete claims of discrimination failed to meet the prima facie case, and the court didn't reach the alternate arguments with respect to whether or not pretext was shown. We believe that the court looks at the record and within its discretion to make decisions that could be affirmed on appeal, whether or not that was the reasoning of the trial court or not. We believe all three of those are appropriately subject to summary judgment. Just as the other claims, constructive discharge, the hostile work environment claims, simply don't rise to the standard necessary to make a submissible case. Counsel, I note the district court did not mention Muldrow. How do you respond to that, to this assertion that Muldrow changed the landscape here as far as adverse action and that the district court erred in its analysis? I understand that Muldrow, I think, came out right about the same time as the district court order was entered. How would you respond to that? I guess my response would be twofold. First, to completely agree with you, with respect to discrimination claims, not retaliation claims, but with discrimination claims, Muldrow did change the standard for an adverse employment action in the sense that the requirement is no longer to show significant or substantial harm but to show some harm. Again, we believe in this case that even with respect to the transfer, where there were no financial repercussions and that there were no impact on the ability of the claimant to get a promotion, that there was, in fact, no harm, but even if there was, we believe that the prima facie case still fails for failure to show a causal connection to race or retaliation would be under the old standard, which is set forth in Burlington Northern v. White, which does require some substantiality. But we think even if Muldrow should have been mentioned, that mentioning it and its standard would not have changed the outcome given the findings and the summary judgment record that were presented to the district court. If there are any other questions, I would just say on behalf of the Secretary of the Department of Veterans Affairs, we respectfully request the court affirm the judgment of the district court entered following its error-free entry of summary judgment on behalf of the Secretary. Thank you. Thank you, Shree. Ms. Randles, your rebuttal. Thank you, Your Honor. There was a question concerning the reassignment from misconduct and whether or not that created any harm. We had testimony from two individuals, the HR representative and the testimony from Frye. Both of them testified opposite each other. There was no investigation because the HR investigator said, well, any investigation would come from Frye. Frye said she didn't do it. So then Frye said, well, any investigation has to come from HR. HR said HR didn't do it. So there was no investigation. There was no fact-finding. All they did was take her out of service, give her a humiliating position where she pulled supplies for the entire hospital, including sometimes pulling supplies for the supervisees that she had previously supervised. So this was intended to be humiliating, and it was humiliating, and it continued to be humiliating for 14 months because it appeared that Ms. Sherman had done something wrong, when in fact there was never an investigation to determine whether anything had been done wrong. That violated the policies of the VA, which shows that it's also pretextual. It violated the policies of the VA to give her the unacceptable review. That violated the policies of the VA as well, so that was also pretextual. And in terms of harm, with regard to the reassignment, the harm was humiliation. It was taking her away from any kind of supervisory activity, which under wedlock shows that there is a violation and that that is retaliation and it is a form of adverse action that is actionable.